Good morning, ladies and gentlemen. Our first case for this morning will be Peerless Network against MCI Communications. Mr. Angstreich. Thank you, Your Honors. The central claim before the District Court was whether Peerless was entitled to all of the tariffed amounts that it had billed to Verizon. But that claim is unresolved. The District Court did not decide Peerless's ultimate entitlement to that money, but instead referred critical issues to the FCC, where they remain pending for resolution. As a result, the Rule 54b judgment was improperly entered and should be vacated, and the summary judgment decisions on the tariff claims are interlocutory. Final determination of the amounts, if any, that Verizon owes to Peerless need to await resolution of the actual substantive disputes between the parties, which are now before the FCC. But if the Court were to reach the merits, it should reverse. Verizon can withhold amounts when it claims Peerless didn't follow its tariffs in billing Verizon. The tariffs themselves and FCC precedent, like WIMAX, make that clear. Verizon can also withhold amounts when it contends that Peerless violated a benchmark rule. Let me ask you this before you get too much into the merits. If we were to agree with you that, let's say, the counts that relate to the matters that have been referred to the FCC are too closely related to justify 54b, doesn't that still leave the breach of contract count as properly before this Court on a 54b? It certainly leaves the breach of One and two, switched access, the breach of the tandem service agreement. Yes, so we did not claim that the judge was wrong in thinking that was final. I do question, and we didn't raise this, but I know the Court has a sua sponte obligation to assess the abuse of discretion. I will say, I don't think that if Judge Durkin thought that the only claims in the case or claim in the case that was final was the $30,000 breach of contract claim, that he would have concluded that there was no just reason for delay. But he wasn't presented with that question because he thought... He included all of them. He included all of them. In a $50 million case, it seems strange to have finality on a $30,000 claim and only on a $30,000 claim. But it sounds like you're not wildly opposing that thought either. No, no, because we think there the judge clearly erred. He concluded from a statement in fact and a paragraph in our answer that somehow we had actually conceded that we had breached the contract. I think we showed in our briefs that we did no such thing. We contended from the start of the case through the end of summary judgment briefing that we had not breached that contract in any way, shape, or form for the simple reason that it was a beneficial contract. Pure List had offered Verizon rates that were below the prevailing market rates for a service Verizon needed to buy. We were happy with that contract. Let me ask, before we go on to those the same question about Count 5, the state tariff claim. How is that impacted or affected by the federal tariff issues that were referred to the FCC? Sure, Your Honor. It's affected primarily by the rate parity rule. In 2011, when the FCC essentially federalized the entire space of inter-carrier compensation, it ordered all carriers to reduce certain of their state tariff rates to be equal to their federal tariff rates. In July 2012, by cutting that distance in half, and in July 2013, by making them equal. If we are right that Pure List's federally tariffed rates were too high, then Pure List's state tariff rates, at least as of July 1, 2012, which covers the bulk of the period here, were also too high. The FCC in Orion did use that rate parity rule to strike down a state tariff. In that respect, particularly, the state tariff claims are tied up at the FCC. We also argued that Pure List in billing its state tariff rates for intrastate calls to two-stage platforms, or for VoIP calls, didn't follow the terms of those tariffs either. While the judge didn't refer those issues to the FCC, he also didn't resolve them. In that way, as well, the state tariff claims remain non-final. Is this the one where the order supplemental briefing, but then no briefing was ever done? No, we had supplemental briefing on the implications of the DC circuits. Oh, I'm sorry, so no. The short answer is no. We did have supplemental briefing on the effect of the DC circuits decision on the VoIP issue. He did offer the parties the supplemental filings on damages. And Pure List has argued that because we accepted their numbers, and when we both realized that Pure List had made two errors, one in their favor, one in ours, we corrected them, and we accepted their numbers, that we somehow didn't do something the judge had offered us the opportunity to do. But in the summary judgment room, the judge decided that we were liable under the tariffs. We had to pay them irrespective of the merits of the disputes. And on the contract, that we had breached the contract, and the only question left was, by how much? And I don't read his opinions to have given us the opportunity to come forward with evidence that says, I know you found that we breached the contract, but the actual amount by which we breached it is zero, because we didn't breach it. Pure List came forward and gave us a number of $30,000. It wasn't worth the fees and time to fight over that. We wanted to appeal the underlying liability finding where we don't think there were no dispute of material fact as to the question whether we breached the contract. If I can turn back to jurisdiction, though. Sure, please. The Horne case from a while ago now makes clear that theories of relief are not separate claims, even when they're pled in separate counts. What we have here are, as in Marseilles, different legal theories that are aimed at the same recovery arising out of a common set of facts and circumstances. I will tell you that by some quirk of Illinois culture, this is referred to as Marseilles. A terrible thing for somebody like me, who is a Francophile, but it's Marseilles. Well, then we are in the area contemplated by Marseilles, that this is not a case like some of the ones Pure List cited in its briefs, where somebody has completely different theories of themselves. Not even like the situation in Curtis Wright, where Curtis Wright claimed that it was owed $20 million or so dollars under the contract, and GE said, but you owe me money for an entirely different thing related to the contract, to be sure, but because I had undertaken extraordinary efforts to stop you from breaching, and ultimately we would net out those two amounts of money. More or less like a set off from a permissive counterclaim, as opposed to an offset. Exactly. What we have here is a single set of calls exchanged between the parties, and both sides disputing whether Verizon does or doesn't owe Pure List for those calls. The district judge seems to have seen this as a situation in which Verizon had been withholding payment, obviously some contest here about whether the tariffs permitted that withholding, and that Pure List had gone without its money for eight years, so the money should go over to Pure List and then be recouped by Verizon if the FCC ruled in some respect in Verizon's favor. I suppose that's a way to think about it, but we need to relate that scenario to finality. That's true, Your Honor, and if I could pause as a side note, the notion that we weren't paying for six or eight years has no basis in the record. It's in fact contradicted by other parts of the judge's opinion, like at page appendix 33, where the judge recognizes that it wasn't until 2013 that our relationship broke down. That's why we entered the standstill agreement. Pure List filed its complaint the next year. The record showed that, for example, from 2008 to 2010, we at least put in facts that we paid 97% of the amount that Pure List billed. That's going back six years before the complaint. So this notion that Pure List had been sitting around waiting for half a decade or more for money is simply inconsistent with both the record before the court and other parts of the opinion. I thought it was implausible in their notice claim, because I suppose I was naively thinking that if you were a business and sending bills out to people and they weren't paying them, you might notice that. There might be an audit or there was, Your Honor, and we put in summary judgment an extensive compilation of record evidence showing that through letters and emails and in-person meetings and conference calls, we identified for Pure List why it was we were disputing their invoices, which invoices we were disputing, how much of those invoices we were disputing. And certainly the district court didn't conclude that we had done something improper in terms of notice. In fact, in the only count, count 10, where the notice issue came up, the judge granted summary judgment for Verizon. It was the only ruled on for us. He did not find that Pure List's tariff made providing proper notice as deemed or defined by Pure List a precondition for withholding disputed amounts. Nothing in section 3.63 B and C suggests that such notice is a precondition. And certainly Orion makes clear that where the claim is that the carrier's tariff violated a benchmark rule in a mandatory tariffing order, that you are not obligated to pay then dispute. And we are in the same position AT&T was there. AT&T concluded that Orion had violated one of these rules. It withheld virtually all of the money. Orion sued. A primary jurisdiction referral ensued. And that case was stayed pending final disposition by the FCC. That's what happened in the Teleax case, the district court pointed to. That's what should have happened here if the district court elected as it did not to resolve the party's disputes on the merits, which is what the parties had urged the court to do. Why wouldn't this fall within the language of the reader case that when you, that a 54 B is appropriate to split up a collection claim from an unreasonable rate claim? Sure. So two reasons. Which I think is what the district court's main reasoning was. I think that's right. So two reasons. First, our VOIP and two-stage disputes were not unreasonable rate claims. They were, you didn't provide us the service defined in your tariff claims. And Rider didn't have a case, a claim like that. In Rider, the shipper, or I guess the carrier, had agreed by contract to a rate below its tariff. And then, because at least in the interstate commerce commission world, you're not supposed to do that. Ultimately when it went bankrupt, it said, well, you should actually pay us the tariff rates because we weren't really supposed to sign a contract with below tariff rates. And the person who sent the goods via the carrier claimed that the rates were unjust and unreasonable, but they didn't claim that they didn't get the tariff service. They handed over the goods, the goods were shipped in interstate commerce the way they were supposed to have been. Here, our first two claims are the kind of claims that Rider recognized are defenses. And at page 256, recognized that a defense cannot possibly be adjudicated separately from the plaintiff's claim to which it applies. Now, on the unreasonable rate contention, which is similar. That's the access stimulation, right? That is, yes. So how clearly did you draw this distinction that you're now drawing before the district court? The district court spends most of its opinion talking about access stimulation. So I thought we threw it very clearly. And I think at least in the primary jurisdiction section of the opinion, you can see that because at page 50 of the appendix, Judge Durkin describes our VOIP dispute precisely, that we claimed that Peerless didn't provide end office switching as defined in its tariff. That's why he cites cases like Teliax and 01, where that was the very question. And we argued, and you see this at page 54, that with the two stage dispute, we argued they didn't terminate the calls within the meaning of the definition of termination in their tariffs. And that's why he cites the Broadvox case from Maryland, which also involved a question of tariff compliance. So I think we raised them very clearly. It's not clear to me why, in the footnote without explanation, the judge thought that the conclusion that we have to pay them dispute and then maybe get our money back applied to all three. Would a resolution of your VOIP and two stage caller claims require a modification of the tariff? Absolutely not. Why not, given that the tariff defines end users to include both of those provisions? So we never argued that it was illegal for them to define end user to may include VOIP providers. What we argued was, and so a little background, the FCC's normal rule is you, telephone company, can charge for the work you do. And then in 2011, they open up an exception to that and say, well, you can charge for the work you do or the work your VOIP provider partner does. And with regard to VOIP calls, we argued that Peerless and its partner together didn't provide the functional equivalent of end office switching. That's what the 01 court found. And it's the question that's teed up and fully briefed in front of the FCC right now. Whether the customer, the VOIP provider is an end user or not has nothing to do with whether Peerless and the VOIP provider together are providing the functional equivalent of end office switching. Where Peerless, the footnote that Peerless talks about, we pointed to the end user definition, that's actually in the two-stage section of our brief. In the two-stage section, we argued if you look at the definition of terminating, when the call goes to a platform and then goes to India or China or wherever the caller really wants to call, it is in no way, shape, or form terminated within the meaning of that word in the tariff. We then in a footnote noted a certain logical inconsistency in Peerless's position. For the VOIP traffic, they wanted to take advantage of the work the VOIP provider was doing, built for that work themselves, in getting the call to the actual person dialing or answering the phone. And we point out this is logically inconsistent for Peerless to be claiming that the same VOIP provider whose work it was relying on to get the call to the actual end user was in fact an end user, or the end user, for purposes of the calls. It was merely a logical inconsistency we were pointing out, no illegality, and it didn't go to the actual terms of the tariffs that we said that they weren't complying with. I see him in my rebuttal time. I'd like to reserve the rest if I may. That would be fine. Thank you. Thank you. Mr. Kelly. Good morning, Your Honors. Good morning. My name is Henry Kelly on behalf of Peerless Network. This appeal is founded on the district court's proper application of the filed rate doctrine. But I'm concerned about the 54B, to be honest, because we have made it clear that different theories don't make something different, and actually you're looking for something almost like a United Mine Workers against Gibbs distinction. If it's an entirely different entitlement, separate recoveries, then you have a 54B separate, quote, claim, close quote. But wholly apart from whether your client ought to prevail in the end is the question whether this is coming to this court at the right time. So I think as the courts recognize there is jurisdiction under the court below's decision. Right, the breach of contract. But focusing more on the tariff questions, first of all, as the Ryder case does point out, the filed rate doctrine is different than just the normal 54B case with common claims. Well, but is it? I mean, you know, obviously the filed rate doctrine protects both the rates and the terms and all rest of it. But if the question is compliance with the rate as opposed to a challenge to any of those things, a term, a condition, the amount, what have you, I can't get away from the fact that you're asking us to intervene halfway through the determination of how much money is owed from A to B or from B back to A. And we are going to have to go back and redo the thing if the FCC in any way rules in Verizon's favor. So if you win, then fine. But you can't do it that way. So I think you have to break it down sort of structurally how these claims are brought. Peerless brought a tariff collection case. And the court found that Peerless had made its prima facie case to collect on its tariff. The tariff was property filed. It was a legal tariff. It was a lawful tariff, deemed lawful by pursuant to statute. And that Peerless had provided services to Verizon under pursuant to the terms of that tariff. And in fact, the court finds at Joint Appendix 58 that Verizon didn't contest this fact. And more significantly, after the court goes through all of Verizon's claims about its defense, the three issues it stimulated, the two-stage calls and the void calls, the court ended up denying, enters a ruling specifically denying Verizon's defenses. Well, but it didn't entirely. The court refers some very significant issues to the FCC under the primary jurisdiction doctrine. And it says a couple of times in its opinion, the FCC is the expert here. It's not me. Let the FCC sort this out. Did you argue that there should be no primary jurisdiction referral? We did not argue that there should be no primary jurisdiction referral with respect to Verizon's counterclaims. So think about, you have to look at it back as how Verizon pled its counterclaims to. There were four counterclaims pled by Verizon. One was a recovery under Pyrrhus' federal tariffs. Count two was, of its counterclaims, a recovery for overcharges under its federal, state tariffs, and the declaratory judgments that Pyrrhus, that Verizon was entitled to recover. Now, if you had to characterize them, they're in the nature of compulsory counterclaims. And it's proper for the court in a 54B finding where there are compulsory counterclaims, where there's a filed rate doctrine, and the court concluded that Pyrrhus had met its prima facie case for its tariff collection cases. And the court did address each of the Verizon's issues that it raised, and then ultimately rejected them for purposes of the defenses, but still preserved Verizon's counterclaims on the three issues that it raised for purposes of the counterclaims. Right. And so the same calls, the same facts that we're now dealing with will be before the FCC and then would come back again. It seems extraordinarily inefficient. Not in this instance, Your Honor. First of all, it's unknown. I think that would be whether, that gets to not whether the judgment, the Rule 54 finding was proper. It's whether it was proper for the court to conclude there's no just reason to delay enforcement of the judgment. I'm not sure about that. I mean, entirely different legal entitlements yielding separate recoveries. That's the language we used in Marcell's. But in the filed rate doctrine, Marcell's case was not a filed rate doctrine. I know that. In a filed rate doctrine, once Pyrrhus established its prima facie right to recover under its tariff, and Verizon acknowledged that, the court finds that Verizon acknowledged that Pyrrhus was entitled to recover under its tariffs. Well, in the abstract, I just heard Mr. Angstreich say that they weren't challenging anything about the tariff. They accept the filed rate doctrine. But they're saying you were not doing what the tariff said you were going to do. And that's just inconsistent with the court's findings in Appendix 58. The court says Verizon does not contest that Pyrrhus filed the tariff with the FCC, that Verizon received services under the tariff, or that Pyrrhus billed the rates set forth in the tariff. So we think that that's sufficient. That's pretty broad because I'm sure they're, as I hear them, they're saying, yes, we got some services, but we didn't get others, and you were using the wrong part of the tariff. So for example, with this end service, if you're charging, now maybe that's the right thing to do. Again, I don't know. The FCC will figure this out. But if termination means terminating at the platform instead of terminating in Germany, then you terminate it. But if it means the person who was called is the terminating point, then that's different. But that's not challenging the rate so it's an application. And that's where I think the court did address Verizon's defenses. I mean, this is really a question about whether Verizon's defenses to Pyrrhus' prima facie tariff collection case were properly addressed by the court. But can't the FCC take a fresh look at all of that? The FCC is not bound by what the court said. The FCC can take a look at the issues that were to refer to the FCC. Which could undo the payment that's going from Verizon to you. But there's a different element to the issues that were referred to the FCC. So if you remember- Couldn't they impact the issues that were referred to the FCC in the counterclaims? Couldn't they directly impact the affirmative defenses here, given the overlap between the two? So if the FCC comes out differently than the district court judge did on the VoIP issue, wouldn't that directly impact the affirmative defense? It would impact the amount that Pyrrhus would ultimately be entitled to keep. But it wouldn't impact Pyrrhus' tariff collection case, the prima facie case that Pyrrhus made. What do you mean when you say that? I mean, frankly, isn't this about the money? I mean, the first thing that it would impact is at the heart of the case. But if we go back to the file rate doctrine, once Pyrrhus' tariffs were deemed lawful, and they were deemed lawful, there's no dispute that Pyrrhus had deemed lawful rates. But the rates that are being properly charged pursuant to those tariffs are unassailable. That Pyrrhus is entitled to collect them. Of course, if Pyrrhus is doing that work. But to take an extreme example, what if Pyrrhus has a perfectly good tariff, but it decides just to do something entirely different? That doesn't impugn the tariff at all. But it does mean that the recipient isn't getting what the tariff promised. And the court did address the two-stage and the void disputes, to the extent they were defensive rates. Barely. I mean, just this little footnote, well, it's the same as access stimulation, which it clearly is not. And it's not just that, Your Honor. In paragraph, in footnote 32, the court, with respect to the VOIP issue. Now, Verizon had raised in its counterclaims that Pyrrhus could not collect on originating VOIP calls, calls from an end user destined to Verizon, unless Pyrrhus was the issuer of the telephone number. And the court said in footnote 32, appendix 51, that the court was skeptical of the arguments on this issue, and then went through an analysis and rejected Verizon's argument. And then says, however, because the AT&T order questioned whether SELEX, like Pyrrhus, can collect under the VOIP symmetry rule at all, the court finds referral appropriate. It begins that footnote with an expression of skepticism, but it doesn't resolve it. But see, that's the interesting part. If you recall from the briefs, Verizon on the VOIP issue did not raise, there's two VOIP issues. There are VOIP defense and VOIP counterclaim, are really kind of one generic term for two different things. But don't they factually overlap to the point that having the jurisdiction on that issue come before us? But there's still two different issues. Ultimately, whether Pyrrhus had to be, pursuant to its chair, had to be the issuer of the telephone number in order to collect those end office charges on the VOIP calls, the court rejects that. But then says, because there was supplemental briefing in December 2016, after the original, after the full briefing on summary judgment was brought, there was a supplemental briefing because the AT&T order had come out from the federal circuit, saying that there's an overall question about whether any VOIP calls would be entitled to end office charges rather than the lower tandem charges. And ultimately, it's that question, the question of whether any VOIP calls would be entitled to end office switching versus tandem switching, is what the district court referred to the FCC, and that is being pursued now at the FCC. But wouldn't the answer to that question impact the affirmative defense on the VOIP call? It would have an impact on, ultimately, what Pyrrhus is collecting, but they're two separate issues, and that's why we think that the issues that the court... But you're conceding that it will have an impact. I mean, you're just not spelling out the legal path that will lead to that impact, but it'll have an impact. It'll change what Verizon has to pay. It'll ultimately have an impact on how much the net result is, but that's still, under the Ryder case... But you're shaving the legal issues so finely. It's not been my experience with Rule 54B that you get to that level of granularity to have something that's sufficiently separate to override our very powerful preference for really final judgments in the sense of resolves all claims, all parties. It doesn't have to resolve all claims of all parties. A normal final, a 1291, here's where I'm coming from, a 1291 final judgment has to resolve all claims of all parties. Then Rule 54B carves out a practical finality exception to that, saying, well, if there's one party that's just off there and there's no just reason for delay, the court can sever that and say, that's final. That's a 1291 appeal. It's not a 1292A1. It's not a 23F. It's not any of those other things it might be. The same thing is true with the all claims. If it's really a separate claim in the sense of a separate legal entitlement, different facts, different recovery, then the district court is entitled to carve that off. Think about whether there's a just reason for delay. If the judge says, no, let's just get this over and done with, then the judge can certify. But we don't accept every 54B certification. It's our responsibility to see if it fits the rule. So I would urge you to look at the Ryder case because it does make clear that, and I'm sure you have, it does make clear that to the extent that the court addresses the defenses, which we believe the court did in footnote 32 for the VoIP issue on that whether peerless had to issue the footnote 34 with respect to the two-stage dialing question. There the court reject their defenses and properly allows the entry of final judgment. Footnote 32? 32 on the VoIP issue. Yeah, and this is the one that I find inconclusive. It's skeptical, but let's just send it off. And 34, we have the DC Circuit in Beltland being skeptical. That doesn't sound like the language of resolution to me. And what the court does, the court does address peerless' claims and then allows Verizon to pursue its counterclaims in the however part whether SELEX-like peers can collect under VoIP symmetry rule at all, which is the issue that is preserved for Verizon's counterclaims. But the more narrow issue about whether peerless had to issue the telephone number to the end user in order to recover end offers, that's been foreclosed by the court's determination on peerless' claims. But you must admit, that's just one piece of the puzzle. It's not the whole game because that big issue that has been referred to the FCC could unwind everything the court said. But that's still, so I think then it goes, Your Honor, to whether the court abused its discretion in finding a Rule 54B, that there was no just cause or reason to delay. Well, I agree with you that that part of 54B calls on the district court to exercise discretion. I don't think the first part does. And I want to agree with that. And I'll just point out that Verizon doesn't contest in any way Judge Durkin's conclusion that there was no just cause or reason to delay. Enforcement of peerless' collection action. But you know, I can't begin to tell you the number of times people would like to have an interlocutory appeal. Because it would be nice for business planning and lots of other things to have certain legal issues resolved. But if the claim's not final, you can't do it. But, and let's go back again, Verizon, if you recall, was withholding millions of dollars from peerless on a monthly basis. And we went to a preliminary injunction hearing because Verizon was claiming, we're not going to pay you anything because your tariffs are in violation of the access stimulation rules, and your tariffs exceed the benchmark. We went to a preliminary injunction hearing before Judge Durkin, and it was concluded that even though Verizon had been claiming that peerless was an access stimulating carrier back to 2012, and in fact had backdated its disputes, even though it had made that peerless was an access stimulating carrier back to 2012, it actually did, Verizon, didn't actually calculate the appropriate benchmark that would be applicable to peerless' rates until January 2016. So Verizon had been withholding 100%, during the course of litigation, had been holding with 100% of the access charges that were, that peerless was entitled to receive under the filed rate doctrine. That doctrine is unassailable, that if the rates are being challenged by Verizon, which is what their primary dispute was, Verizon still had to pay, and Verizon was refusing to pay on the basis of a dispute that they didn't even calculate until January 2016. But they did do the calculation. Of course, Verizon points to language in the tariffs that say they don't have to pay. They can withhold. They can't withhold amounts that are due under the tariff. They have an obligation to pay. Well, they contest that. There's language in the tariffs that looks as though if there's a dispute about whether something is under the tariff or otherwise that they, I'm just saying, you know, having read the briefs, they do say, they point to language in the tariffs that within the tariff itself, it allow, and the tariff is what controls. This is not common law. This is nothing. This is all in the tariff, and the tariff says you can withhold. And there's, as we had an expert testify that there was, that the language in peerless' tariff is pretty typical of language elsewhere in most other tariffs, and that language does not override Verizon's obligation to make payments on actual, where their dispute is related to the rate of the tariff. So what about the language? In the event that the company resolves the billing dispute in favor of a customer who has withheld payment of the disputed amount pending resolution of the disputed bill, the So you withhold at your peril. You may have to pay quite a surcharge as the price of withholding. It seems like balanced incentives. But those, that tariff provision is really for if there's a mistake in the billing. But that's not what it says. It says, it just, we were talking about in principle, can you withhold? And this sure seems to say in the tariff itself that you can. So first of all, the purple bow. And you pay a financial penalty if you're wrong in the end. Verizon's asked on appeal that you make that conclusion, but that's never been an issue that was raised before at the district court level. So the court shouldn't address what the, how that tariff should be construed. It should, we believe it should be construed the way peril's intends it should be construed, which is if you, but there's no ruling by the district court above whether, you know, picking Verizon's ruling that it gets to dispute anything, including the legitimacy, the validity of the rate itself, where our version, which is you can only challenge if there's a misbilling and you give notice as to what the result of what the reason for the misbilling is. Will the issues before the FCC have an impact on the resolution of that question? No, no. And so we think that to the extent that Verizon makes that claim, that's been waived. And they should be. But then going back again to the jurisdictional issue, we think that the court did address Verizon's defenses, the two specific defenses that it raised in the pleadings, in the answer and the counterclaims. That is that PIROS had to be issuing the telephone number in order to collect end office charges on VoIP calls, and that the calls destined to two-stage platforms that are terminated internationally are not entitled to end office charges. We think in footnotes 31, 32, and 34, the court addressed that. The court also denied Verizon's arguments. We think that's sufficient for the court below to find that PIROS's claim and their defenses have been resolved. When the court allowed for the VoIP issue to be extended for purposes of the counterclaim, that is in light of the DC circuits vacating the FCC's order and the AT&T order, which really goes to the FCC's question of whether any VoIP traffic at all should be subject to end office charges. That's an issue that's pending at the FCC. That's the issue that the court referred to the FCC. The court did not specifically refer to the FCC. The two subparts of their defenses, so PIROS believes that we've established our prima facie case, that the court under the Ryder case was obligated to enter judgment on our claims under the prima facie, our tariff collection cases, and then as to the remaining counterclaims, those are separate and distinct claims under the Ryder case, and it was proper for the All right. Thank you very much. Thank you very much. Anything further, Mr. Streit? So, to start, Your Honors, we absolutely, notwithstanding the statement in the middle of page 58, we absolutely contested that we received the services under the tariff for which we were billed. That was the VoIP argument, that they billed us for providing end office switching, but they didn't actually provide it. The two-stage argument, they billed us for terminating switching, but they didn't actually provide it. And you can see that the court acknowledges that we disputed, that we got the services when he describes our arguments. On page 50, Verizon argues that the D.C. Circuit decision that vacated an FCC decision brings into question whether Peerless and its VoIP partner performed a functional equivalent of end office switching. That's the question we raised at the outset of the case. We parked it because the FCC had ruled against us until it was vacated, and then we revived it. And that's the question about whether we got the tariffed services. And the same is true of the two-stage. Now, these were both our defenses to their effort to collect amounts we didn't pay, and the bases for our counterclaims to get back money that we had paid in the past that we shouldn't have paid them. The effect of the district court's decision is just to convert all of our defenses into counterclaims. Because if we have to pay the money out to them, we can get all of it back if it turns out they didn't provide us the services. He didn't reject any of our arguments. So that alone is reason enough to deny or to vacate the 54B judgment without getting to the merits. But if you get to the merits, this notion that Peerless made out its prima facie case because it had a tariff on file, Orion says in no uncertain terms that that is absolutely wrong. Paragraph 15 of the reconsideration order says that a filing that contains rates that the carrier is not permitted to charge does not even meet the preliminary standard for a legal tariff filing. And therefore, cannot become a deemed lawful tariff. And this, Judge St. Eves, to get back to the distinction with Ryder in this context, there was no benchmark regime in the Interstate Commerce Commission's regulation of interstate shippers. But there is here. And what the FCC has said is if you're a telephone company like Peerless, to have even a legal tariff on file, to have a properly filed tariff, you have to comply with the benchmarks. Now, Judge Durkin thought it was enough for them to have a tariff on file and Verizon not to have challenged it. But the FCC explained to the Third Circuit in its Paytech amicus brief that the reason it set up the system this way is it's more efficient to put the burden on the telephone company to get it right than to put the burden on the FCC, which sees thousands of tariffs every month, or the many, many different customers of telephone companies like Peerless to ferret out illegal rates. Peerless can't make out its prima facie case of complying with the benchmark rules without actually showing it filed benchmark-compliant tariffs. And as for the notion that Verizon disputed without knowing what the right rates are, on the face of their tariffs, and we explain this in our reply brief, on the face of their tariffs, you can tell they didn't try to comply. So if you're a company like Peerless, in the normal course, you're supposed to benchmark your rates to the company, the incumbent company that provides service in the same part of the state you do. So in states like California, where AT&T provides service in some parts and what was then Verizon is now Frontier provides service in other parts, if like Peerless you operate in both parts of the state, your tariff has two sets of rates, one for the north of the state basically and one for the south of the state basically, and that's what Peerless's tariffs had. And that's obvious that they were trying to comply with the standard rule. But if you violate, if you are an access stimulator to comply with the access stimulation rule, even though we disagree about which carrier's rates are the lowest in the state, even Peerless agrees that there's only one. You benchmark to the lowest, right? Right, there's just one. And so if they have two sets of rates in their tariff, it's obvious on the face of the tariff that they weren't even trying to comply. So we had defenses, they remain unresolved. We have counterclaims, they remain unresolved. We have a judgment of $50 million that may be undercut by future events. It is not final and it should be vacated. Thank you, Your Honor. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.